IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>NICOLAS COBO-COBO,<br><br>  Defendant. | Case No. CR16-0020<br><br>REPORT AND RECOMMENDATION |

## TABLE OF CONTENTS

I. INTRODUCTION .................................... 2

II. PROCEDURAL HISTORY ............................ 2

III. ISSUE PRESENTED ................................ 2

IV. RELEVANT FACTS ................................. 3
   A. December 2011 Encounter ..................... 3
   B. Current Investigation ........................ 6

V. DISCUSSION ...................................... 9
   A. December 2011 Encounter ..................... 10
      1. Alleged Unlawful Entry ................. 10
      2. Alleged Unlawful Seizure .............. 13
   B. Current Investigation ....................... 15

VI. RECOMMENDATION ............................... 18

## I. INTRODUCTION

On the 15th day of June 2016, this matter came on for hearing on the Motion to Suppress (docket number 20) filed by the Defendant on June 6, 2016. The Plaintiff was represented by Assistant United States Attorney Daniel C. Tvedt. Defendant Nicolas Cobo-Cobo appeared in court and was represented by his attorney, Rockne Cole. The hearing was continued and completed on June 21, 2016.

## II. PROCEDURAL HISTORY

On March 23, 2016, Defendant Nicolas Cobo-Cobo was charged by indictment with one count of misuse of a social security number. Defendant appeared on May 6, 2016 and entered a plea of not guilty. Trial was scheduled before Chief Judge Linda R. Reade on July 11, 2016.

On June 6, 2016, Defendant timely filed the instant motion to suppress. The Government filed its resistance on June 10. Because of the pending motion, the trial was continued to August 15, 2016.

## III. ISSUE PRESENTED

The indictment charges Defendant with falsely using a social security number when filling out an I-9 employment form on December 10, 2015. In his motion to suppress, Defendant asks the Court to suppress "fruit" of an allegedly illegal search and seizure which occurred on December 20, 2011 — approximately four years earlier. At the time of hearing, Mr. Tvedt advised the Court that the Government does not intend to offer any evidence regarding the December 2011 encounter in support of its claim that Defendant unlawfully used a social security number in December 2015. Defendant asserts, however, that the investigation regarding the 2015 charge came following a routine review of Defendant's file. Defendant argues that if there had been no illegal search and seizure in 2011, then no A-file would have been opened, there would have been no file to review, and authorities would not have discovered Defendant's recent allegedly illegal activity.

That is, Defendant argues that the current investigation is "fruit of the poisonous tree." The Government denies the search and seizure in 2011 were illegal, and argues alternatively that Defendant's recent illegal activity would have been uncovered independent of information found in his A-file.

## IV. RELEVANT FACTS

### A. December 2011 Encounter

At approximately 8:00 a.m. on December 20, 2011, Special Agents Michael Fischels and Andrew Lund of the Department of Homeland Security-Homeland Security Investigations were assisting the Cedar Rapids Police Department in conducting surveillance following a recent stabbing. The agents observed a vehicle with a driver matching the description of the individual they were looking for.[1] The agents followed the vehicle to a laundromat, where the driver parked and got out. The agents approached the driver, identified themselves, and explained that they were "looking for somebody that matched his description." They asked the driver for identification and were provided with "some sort of identification" at that time — neither agent could recall precisely what identification was provided — but it was not a driver's license or any other government-issued identification.

In response to questioning, the driver told the agents that he lived on the back side of the building with others, but he did not know whether anyone else was at home.[2] The driver told the agents he was from Guatemala. When asked whether he had any immigration documents which would allow him to reside in the United States legally, the driver admitted he had none. The driver was then told he was under arrest.

---

[1] At the hearing, Agent Fischels testified he could no longer recall the description which he had been given at that time. Agent Lund testified that the suspect was an Hispanic male. The agents were given the name of the suspect, but were not given a description of a vehicle.

[2] Agent Fischels was speaking with the driver in Spanish. The driver told the agents he did not speak English.

3

Elias Mendoza Marcos testified at the instant hearing that he was the driver whom the agents initially approached on December 20, 2011. Marcos testified he drove home from work, parked in the parking lot, and initially noticed the agents as he was approaching the door leading up to his apartment. Mendoza denied that the agents showed their identification, but testified he provided his identification in response to a request by the agents. The agents told Mendoza that they were "looking for someone." According to Mendoza, he did not tell the agents he was from Guatemala and they did not ask him if he had documentation allowing him to be in the United States. Mendoza also denied being told that he was under arrest for immigration violations or that they were taking him to the immigration office. Mendoza testified he was not asked where he lived and the agents did not ask if he lived with anyone else. Mendoza denied the agents asked for permission to enter the apartment and denied giving them consent to enter the apartment. According to Mendoza, "they just went in."

According to Agent Fischels, the driver was told he would be taken to the immigration office in Cedar Rapids for processing and fingerprinting. He was asked whether he had any "belongings" in his apartment that he wanted to take with him to the immigration office. He said yes. Fischels testified he then asked if he could come into the building with him. The driver said he could. Agent Lund testified "we let him know that we would be going in with him" and "he had no problem with that." At that point, another person spoke to the driver and the agents from a window located above the door to the apartment. Either the driver or the second person then opened the door and let them in.

Immediately inside the outside door was a stairway leading up to the apartment. The agents followed the driver up the stairway. When they entered the apartment, there were two other occupants in the common living space. The agents identified themselves and asked the driver and the two other persons to sit on the couch for officer safety

purposes. The agents also asked if there were other persons in the apartment. The agents were told that there was another person sleeping in a bedroom. The agents asked one of the individuals to go to the bedroom and retrieve the fourth occupant. (It was Defendant who was sleeping in the bedroom.)

The agents explained they were looking for someone in connection with another investigation. The occupants were then asked for identification. Each of the occupants provided identification, although none of the identification documents were government-issued. While the record is somewhat imprecise, Defendant may have produced an identification card from work.

At that point, the agents suspected the occupants in the apartment were undocumented. The driver had previously admitted he was undocumented, and Agent Fischels testified that based on his experience it is "common for undocumented aliens to reside together." All of the occupants appeared to be Hispanic, but none of the occupants spoke English, which suggested to the agents that they were not born in the United States. None of the occupants were able to provide any government-issued identification, which Fischels testified is common among undocumented aliens. The agents testified that once the occupants were placed on the couch, they were not free to leave until the agents had completed their investigation.

None of the identification documents produced by the occupants matched the name of the suspect the agents were looking for. Accordingly, the agents concluded that the occupants were not suspects in the CRPD investigation. After reviewing the identification provided by the occupants, the agents asked whether they had permission to be in the United States. The occupants admitted they were not legally in the United States. Based on their admitted illegal status, the occupants (including Defendant) were advised that they were under arrest and would be transported to the immigration office to be processed and fingerprinted. Elias Mendoza testified they were told by the agents that if a check of the

occupants' fingerprints showed they had no prior criminal record, then "they would take us back to our house." The agents denied the occupants were promised they would be released if they had no prior criminal record. A decision on release would be made by a supervisor.

The agents called the police to assist in transporting the occupants of the apartment to the immigration office. Before leaving, the occupants were given an opportunity to obtain any belongings, which Agent Fischels described as "standard practice." Defendant, who had been sleeping, was allowed to get dressed. The occupants were handcuffed prior to transport. At no time were any of the occupants given a *Miranda* warning.

Upon arriving at the immigration office, a criminal history check was conducted on each of the four occupants of the apartment. None of the individuals had a prior criminal history, although Agent Fischels testified he believed Defendant had an "immigration history." That is, Defendant had previously been encountered by immigration authorities and was assigned an "A number."

While being processed at the immigration office, the agents obtained the occupants' biographical information, including names and birth dates. Generally, fingerprints are taken electronically and submitted to the FBI. Charging documents are issued by a supervisor and served on the alien, together with other forms such as a counselor rights form, legal aid list, and notice to appear.

### B. Current Investigation

Justin Osterberg, a deportation officer with the Department of Homeland Security-Immigration and Customs Enforcement, testified regarding the investigation which led to the current indictment. On December 22, 2015, an email from Richard Moore to Jonathan Kovach, both officers with the Department of Homeland Security, was laid on Osterberg's desk. *See* Exhibit 6. Kovach was conducting surveillance at a residence and wrote down a series of license plates numbers. The email showed that one of the license plate numbers

corresponded with a 2011 Ford Fiesta registered to Defendant Nicolas Cobo-Cobo. The registration information showed Defendant's date of birth and social security number. That is, the email placed on Osterberg's desk on December 22, 2015 suggested Defendant used a social security number ending in 4601 to register a motor vehicle. At that time, Osterberg did not have a copy of Defendant's A-file. Osterberg ordered Defendant's A-file on January 7, 2016, and it was received on January 19.

After reviewing the email from Moore to Kovach, Officer Osterberg sent the information to the Iowa Department of Transportation ("IDOT") to see if the same social security number was used to register any other vehicles. A copy of the email, dated January 21, 2016, was introduced as Exhibit 7. Matthew Dingbaum, an investigator with the IDOT, responded the same day and advised Osterberg that the social security number "shows it was issued in CO 1997-1998 so I am assuming the SSN does not belong to him." Dingbaum also identified another vehicle apparently registered to Defendant.

Officer Osterberg also obtained a report dated February 8, 2004, showing a "border event" involving Alejandro Hernandez-Hernandez. *See* Exhibit 8. Osterberg testified that the fingerprints obtained during the 2004 event matched the fingerprints obtained from Defendant when he was arrested in December 2011. While the record is somewhat imprecise, the report regarding the border event in 2004 was apparently obtained by Osterberg from Defendant's A-file. (Osterberg referenced the photo on the report when he emailed Investigator Dingbaum on January 21, 2016.)

On January 21, 2016, Osterberg received an email from Juston Jennings, a special agent with the Office of Inspector General for the Social Security Administration, indicating that the social security number provided by Osterberg was "assigned to someone else." *See* Exhibit 9. (In a "timeline" submitted by the Government as Exhibit 5, it is asserted that Osterberg sent the request to the Social Security Administration earlier on January 21, but a copy of that email was not introduced as an exhibit at the hearing.)

When reviewing Defendant's A-file, Officer Osterberg found an employment ID card from Carlson Building Maintenance. On February 12, 2016, Osterberg contacted Carlson Building Maintenance and requested a copy of Defendant's employment form I-9. Carlson Building Maintenance responded on the same day, providing the requested documents. *See* Exhibit 10. The I-9 form completed by Defendant on December 10, 2015, which was not introduced as an exhibit, allegedly shows Defendant used a false social security number.

On March 23, 2016, Officer Osterberg contacted Iowa Workforce Development to ask about Nicolas Cobo-Cobo using the social security number ending in 4601. In a response sent on the same day, Michelle Saddoris, an investigator with Iowa Workforce Development, identified three employers for that social security number. *See* Exhibit 11. In addition to Carlson Building Maintenance, Iowa Workforce Development identified Cancun #2, Inc. and Adelitas Mexican Grill. Osterberg attempted to obtain I-9 forms from those employers, but was told they were misplaced or could not be located. However, Adelitas provided a W-2 or W-4 form.

A detention hearing was held on May 31, 2016. At that time, Officer Osterberg gave a different explanation as to how the current investigation was initiated. Osterberg testified that "things were shuffled around in our office" and he was given a section of A-numbers. According to Osterberg, Defendant's A-number had "an expired call-up." Osterberg explained that "an expired call-up" is a date established by a previous officer "for just a routine check to see what's going on with that particular file." Because of the expired call-up, Osterberg ordered a copy of Defendant's A-file.[3]

According to Officer Osterberg, he reviewed the A-file, saw the work identification card, and sent a request to Carlson's Building Maintenance to obtain a copy of the I-9

---

[3] Officer Osterberg testified that the immigration proceedings started after the encounter with Defendant in December 2011 was subsequently closed by an immigration judge.

form. Osterberg testified at the detention hearing that he then investigated the social security number found on the I-9 form and discovered it had not been assigned to Defendant. On cross-examination, Osterberg confirmed that "this investigation began during a routine review of the immigration files." Osterberg was asked: "So outside of the immigration file, there was no independent source of information for you to begin the investigation." Osterberg responded: "Not that I know of." Now, Osterberg says that the investigation started on December 22, 2015 when he reviewed the email from Officer Moore to Officer Kovach, *before* he asked for and received a copy of Defendant's A-file. In response to questioning by Defendant's attorney, Osterberg testified that he remembered the investigation began on December 22, 2015 when he was driving back to his office following the detention hearing.

## V. DISCUSSION

Relying on Officer Osterberg's testimony at the detention hearing that this investigation began during a routine file review, Defendant asks that all of the evidence obtained during the recent investigation be suppressed. Defendant argues that the "search and seizure" in December 2011 was unlawful. According to Defendant, if the agents had not unlawfully entered his apartment in December 2011, and if he had not been unlawfully seized at that time, then there would have been no A-file established and nothing for Osterberg to review in January 2016. Defendant concludes, therefore, that the entire investigation conducted by Osterberg earlier this year is "fruit" of an illegal entry and seizure in 2011. In response, the Government argues the agents entered the apartment with consent and there was no unlawful seizure. Alternatively, the Government argues that the recent investigation began in December 2015 and Defendant's illegal activity would have been inevitably discovered independent of his A-file.

## A. December 2011 Encounter

I will first address Defendant's argument that the agents violated the Fourth Amendment when they entered his apartment without a warrant. I will then address Defendant's argument that, after entering the apartment, the agents unlawfully seized Defendant.

### 1. Alleged Unlawful Entry

The Fourth Amendment protects persons and property against unreasonable searches and seizures. A person's home is provided special protection. *Payton v. New York*, 445 U.S. 573, 588-90 (1980); *United States v. McMullin*, 576 F.3d 810, 814 (8th Cir. 2009) ("Fourth Amendment law recognizes the inherent sanctity of a person's house."). "The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). A warrant is not required, however, when "voluntary consent has been obtained, either through the individual whose property is searched, or from a third party who possesses common authority over the premises." *Id.* (internal citation omitted).

Here, the Government argues that the warrantless entry into Defendant's apartment was not unlawful because consent to enter the apartment was given by the driver, who also lived there. It is undisputed the driver, Elias Mendoza, lived in the apartment and, therefore, had authority to give consent. Defendant argues, however, that as a factual matter no consent was given.

Agent Fischels testified that after it was determined the driver of the vehicle was unlawfully in the United States, he was arrested and told he would be taken to the immigration office. According to Fischels, the driver was given an opportunity to retrieve any "belongings" from his apartment, which Fischels described as "standard practice." According to Fischels, the driver said he wanted to retrieve certain items from his apartment and Fischels asked if the agents could accompany him into the building. The

driver consented. According to Agent Lund, the driver was told "we would be going in with him" and "he had no problem with that." The driver, Elias Mendoza, testified at the instant hearing that no consent was given.

I find Agent Fischels and Agent Lund to be credible. I believe Mendoza consented to the agents entering the apartment with him. Accordingly, if the consent was given voluntarily, then there was no Fourth Amendment violation. In his brief, Defendant asserts that the agents "entered Defendant's apartment without permission and apparently without a warrant," and argues that such a warrantless entry is unconstitutional. Defendant did not address the voluntariness of any consent, however, and did not reply to the Government's brief, which addresses the issue at length.

The Government bears the burden of establishing, by a preponderance of the evidence, that Mendoza's consent to enter the apartment was voluntary. *United States v. Comstock*, 531 F.3d 667, 676 (8th Cir. 2008). In determining whether consent is voluntary, the Court considers the "totality of the circumstances." *Id.* In considering whether a consent is voluntary, the Court may consider the following factors:

> 1) his age; 2) his general intelligence and education; 3) whether he was intoxicated at the time; 4) whether he consented after being informed of his Miranda rights; and 5) whether he was aware of his rights and protections due to previous arrests. Other relevant circumstances include: 1) the length of time the subject was detained; 2) whether the officers acted in a threatening manner; 3) whether any promises or misrepresentations were made; 4) whether the subject was in custody or under arrest at the time; 5) whether the consent occurred in public; and 6) whether the subject was silent as the search was conducted.

*Comstock*, 531 F.3d at 676-77 (quoting *United States v. Saenz*, 474 F.3d 1132, 1137 (8th Cir. 2007)). These factors are "valuable" in considering whether a consent is voluntary,

but the Court does not employ them "mechanically." *Id.* (citing *United States v. Chaidez*, 906 F.2d 377, 380-81 (8th Cir. 1990)).

The first five factors weigh both for and against a finding that consent was given voluntarily. The record is silent regarding Elias Mendoza's age, but he appeared to the Court to be in his 30s. The record is silent regarding Mendoza's education, but based on his testimony it appeared he is of at least average intelligence. Mendoza testified he was returning home from work when the encounter occurred, and there is no evidence he was intoxicated or under the influence of any controlled substance. So, the first three factors support a finding his consent was voluntary. On the other hand, despite being under arrest, Mendoza was not informed of his *Miranda* rights. Mendoza apparently had no prior criminal record and was not informed by the agents that he could refuse their request to enter his apartment.

Similarly, the "environmental" factors are mixed in this case. Mendoza had not been "detained" for a lengthy period of time prior to giving his consent to enter the residence. There is no evidence the agents acted in a threatening manner, or made any promises or misrepresentations prior to Mendoza giving his consent. On the other hand, Mendoza was under arrest at the time consent was given. The encounter occurred "in public," although it was behind a building and there were apparently no bystanders.

After considering the totality of the circumstances, I believe Mendoza's consent to enter the apartment was voluntary. While Mendoza had been placed under arrest shortly prior to giving consent, there were only two officers present, they were in plain clothes, they had not placed Mendoza in restraints, they did not raise their voices or display their weapons, and they made no threats or promises to gain Mendoza's consent to enter. The fact the agents did not tell Mendoza he could refuse consent is a factor which the Court may consider, but the agents had no legal obligation to advise Mendoza of his right to refuse and, standing alone, that fact does not render the consent involuntary. Because

Mendoza voluntarily consented to the agents entering the apartment, there was no Fourth Amendment violation.

### 2. *Alleged Unlawful Seizure*

Next, Defendant argues he was unlawfully seized. Defendant notes the agents were looking for someone else, and argues "[t]hey had no reason to suspect Defendant was in [the] country unlawfully." Defendant concedes in his brief that "[o]fficers may approach someone to determine [if they] are in the country illegally without violating [the] 4th Amendment," but argues "they may not seize them without a reasonable suspicion to check their alienage." The Government argues Defendant was not seized.

Not all contacts between a law enforcement officer and a private citizen implicate the Fourth Amendment. *United States v. Delgado*, 466 U.S. 210, 215 (1984) ("Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons."). It is undisputed that "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures by merely approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage — provided they do not induce cooperation by coercive means." *Id.* Here, the Government argues that "mere questioning" of Defendant in his apartment did not constitute a seizure.

It is noteworthy, however, that the encounter did *not* occur in a public place. That is, Defendant could not simply ignore the agents' inquiries and "walk away." Defendant was in his home and to avoid the agents completely, it would have required Defendant to leave his own home. (Defendant could not demand the agents leave, because Mendoza had given them permission to enter.) After identifying themselves as law enforcement officers, the agents asked the occupants for identification and instructed them to sit on the couch for

13

officer safety. An "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *Delgado*, 466 U.S. at 216. Both agents conceded that Defendant would not have been permitted to leave at that time. After the officers' instruction to sit on the couch, I believe a reasonable person in Defendant's position would have believed he was unable to leave. Accordingly, I believe Defendant was seized at that time.

That does not, however, end the inquiry. The Fourth Amendment prohibits unreasonable seizures. Defendant's seizure was authorized if the agents had reasonable suspicion to believe that he was unlawfully in the United States. *Terry v. Ohio*, 392 U.S. 1 (1968). That is, an officer must have "a reasonable articulable suspicion that criminal activity is afoot." *Id.*

"Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible. They are common sense, nontechnical conceptions that deal with the 'factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). The reasonable suspicion standard is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," but requires "at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Id.* at 123-24.

Here, the agents knew that one of the occupants in the apartment was in this country illegally. Elias Mendoza admitted he was undocumented and the agents placed him under arrest. Agent Fischels testified that based on his experience it is "common for undocumented aliens to reside together." After entering the apartment, the agents

discovered that the occupants appeared to be Hispanic and none of them spoke English, which suggested to the agents that they were not born in the United States. None of the occupants in the apartment were able to provide government-issued identification, which Fischels testified is common among undocumented aliens. Using a "common sense, nontechnical" approach to the totality of the circumstances, I believe the agents had a reasonable, articulable suspicion that the occupants of the apartment, including Defendant, were in the country illegally. Accordingly, their "seizure" while being subjected to additional questions regarding their legal status was not unlawful. It should be noted that immigration officers may "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" without a warrant. 8 U.S.C. § 1357(a)(1).

In summary, because they received consent from an occupant of the apartment, the agents' entry into the apartment was not violative of the Fourth Amendment. While Defendant was seized by the agents when instructed to sit on the couch in his living room, the agents had reasonable suspicion at that time to believe Defendant was unlawfully in the United States. The agents had statutory authority to then question the occupants of the apartment, including Defendant, regarding his "right to be or to remain in the United States." Accordingly, I find no constitutional violation in December 2011 and Defendant's motion to suppress should be denied.

### B. Current Investigation

Because Defendant's constitutional rights were not violated in December 2011, his motion to suppress should be denied. In the event the district court disagrees with my analysis in that regard, however, I will also address the Government's alternative argument that Defendant's recent illegal activity would have been inevitably discovered without reference to Defendant's A-file.

Defendant is charged with one count of misuse of a social security number. It is alleged that he falsely used a social security number when filling out an I-9 employment

form at Carlson Building Maintenance on December 10, 2015. At the detention hearing, Officer Osterberg testified that the investigation began with a routine review of Defendant's A-file in January 2016. At the hearing on the motion to suppress, however, Osterberg testified that he realized when driving back to his office following the detention hearing that the investigation actually began on December 22, 2015, when he reviewed an email from Officer Moore to Officer Kovach. I find Osterberg's testimony to be credible.

On December 22, 2015 — *before* asking for and receiving a copy of Defendant's A-file — Officer Osterberg reviewed an email indicating Defendant had registered a 2011 Ford Fiesta with a social security number ending in 4601. Using that social security number, Osterberg later contacted Iowa Workforce Development to determine whether Defendant used the social security number in obtaining employment. The response from Iowa Workforce Development identified three employers, including Carlson Building Maintenance. Osterberg had previously contacted Carlson Building Maintenance because an employment ID card used by Defendant at that business was found in Defendant's A-file.[4] Even if no A-file had been established, however, Osterberg's investigation would have led him to Carlson Building Maintenance.

"The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *United States v. McManaman*, 673 F.3d 841, 846 (8th Cir. 2012) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). "To have evidence that was obtained after a constitutional violation admitted into court, the government must show that it was not obtained 'by exploitation of that illegality

---

[4] As I understand it, Defendant was working at Carlson Building Maintenance in December <u>2011</u> and a copy of his employment ID card was made and placed in his A-file at that time. The instant charge arises from Defendant filling out an I-9 at the same employer in December <u>2015</u>.

16

but instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

In *Nix v. Williams*, 467 U.S. 431 (1984), the Court adopted the inevitable discovery doctrine, which it described as "closely related" to the independent source doctrine. Both doctrines constitute exceptions to the exclusionary rule generally associated with policemen's conduct. Under either doctrine, evidence is not excluded if it "would put the police in a worse position than they would have been in absent any error violation." *Id.* at 443. Exclusion of evidence that would have been inevitably discovery would "put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place." *Id.* at 444.

Thus, the exclusionary rule does not apply to "fruit of the poisonous tree" if the inevitable discovery exception applies. The Government must establish by a preponderance of the evidence "(1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial alternative line of investigation at the time of the constitutional violation." *McManaman*, 673 F.3d at 846. Under the unique circumstances in this case, Defendant claims that the "constitutional violation" occurred when investigating officers relied on his A-file, which was established following his allegedly unlawful seizure in December 2011. I find the argument unconvincing.

Officer Osterberg credibly testified that this investigation was initiated on December 22, 2015, *before* he asked for and received a copy of Defendant's A-file. The email which started the investigation contained Defendant's name and a social security number ending in 4601, which was apparently used by Defendant to register a motor vehicle. Osterberg was then able to use Defendant's name and social security number in contacting Iowa Workforce Development to determine if the social security number had been used to obtain

employment. That inquiry would have led Osterberg to Carlson Building Maintenance, even if no A-file existed for Defendant. That is, Defendant allegedly using a false social security number to fill out an I-9 form at Carlson Building Maintenance in December 2015 would have been discovered independent of the information found in his A-file. Therefore, even *if* the encounter in December 2011 was unconstitutional and an A-file was improperly established at that time, Defendant's recent allegedly illegal activity would have been inevitably discovered. Accordingly, the exclusionary rule does not apply, and Defendant's motion to suppress should be denied.

## VI. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that Defendant's Motion to Suppress (docket number 20) be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on June 15, 2016.*

DATED this 5th day of July, 2016.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA