**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 16-CR-20-LRR |
| vs. | **ORDER** |
| NICOLAS COBO-COBO, | |
| Defendant. | |

_____

### *TABLE OF CONTENTS*

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *1*

II.   **RELEVANT PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . *2*

III.  **STANDARD OF REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

IV.   **RELEVANT FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . *3*

    *A.*    *December 20, 2011 Search* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*
    *B.*    *The 2015-2016 Investigation* . . . . . . . . . . . . . . . . . . . . . . . . . . *6*

V.    **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*

    *A.*    *Consent to Enter* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*
    *B.*    *Voluntary Consent* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *12*
    *C.*    *Seizure* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*
    *D.*    *Inevitable Discovery Doctrine* . . . . . . . . . . . . . . . . . . . . . . . . . *18*

VI.   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *19*

## I.  INTRODUCTION

The matter before the court is Defendant Nicolas Cobo-Cobo's Objections to Report and Recommendation ("Objections") (docket no. 41), timely filed in response to United States Chief Magistrate Judge Jon S. Scoles's Report and Recommendation (docket no.

34), which recommends that the court deny Defendant's Motion to Suppress ("Motion") (docket no. 20).

## II. RELEVANT PROCEDURAL BACKGROUND

On March 22, 2016, a grand jury returned a one-count Indictment (docket no. 1), charging Defendant with one count of misusing a social security number, in violation of 42 U.S.C. § 408(a)(7)(B).  On June 6, 2016, Defendant filed the Motion.  On June 10, 2016, the government filed a Resistance (docket no. 27).  On June 15 and June 21, 2016, Judge Scoles held hearings on the Motion.  *See* June 15, 2016 Minute Entry (docket no. 28); June 21, 2016 Minute Entry (docket no. 32).  Defendant appeared in court for both hearings with his attorney, Rockne Cole.  Assistant United States Attorney Daniel Tvedt represented the government.  On July 6, 2016, Judge Scoles issued the Report and Recommendation, which recommends that the court deny the Motion.  On July 21, 2016, Defendant filed the Objections.  On July 28, 2016, Defendant entered a conditional plea of guilty to the offense alleged in the Indictment.  *See* July 28, 2016 Minute Entry (docket no. 46).  On July 29, 2016, the court accepted Defendant's conditional plea.  *See* July 29, 2016 Order (docket no. 49).  The government has not filed a response to the Objections, and the time for doing so has passed.  Defendant requests that the court hear further evidence with respect to the issues raised in the Objections.  However, the court finds that an additional hearing is unnecessary for the reasons discussed more fully below.  The Report and Recommendation and the Objections  are fully submitted and ready for decision.

## III. STANDARD OF REVIEW

When a party files a timely objection to a magistrate judge's report and recommendation, "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b)(3) ("The

district judge must consider de novo any objection to the magistrate judge's recommendation."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (noting that a district judge must "undertake[] a de novo review of the disputed portions of a magistrate judge's report and recommendations"). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."). It is reversible error for a district court to fail to engage in a de novo review of a magistrate judge's report when such review is required. *See Lothridge*, 324 F.3d at 601. Accordingly, the court reviews the disputed portions of the Report and Recommendation de novo.

## IV. RELEVANT FACTUAL BACKGROUND

Defendant seeks to suppress his "A-file," which allegedly provided law enforcement with the information leading to the Indictment after a routine review of the A-file in early 2016. Defendant argues that the A-file should be suppressed as "fruit of the poisonous tree" stemming from an allegedly unconstitutional search in December of 2011. Because Defendant's arguments concern both the initial search in December of 2011 and the investigation leading to the filing of the Indictment, the court shall discuss each time period separately.

### A. December 20, 2011 Search

On December 20, 2011, at around 8:00 a.m., Department of Homeland Security–Homeland Security Investigations Special Agents Michael Fischels and Andrew Lund were assisting the Cedar Rapids Police Department in the investigation of a stabbing unrelated to the events at issue in the Indictment.[1] Agents Fischels and Lund observed a

---

[1] Agent Fischels's report of the December 20, 2011 investigation has been filed as
(continued...)

vehicle driven by Elias Mendoza-Marcos and believed, at that time, that Mendoza-Marcos may have been the suspect for whom they were searching. The agents followed Mendoza-Marcos to the parking lot of a laundromat,[2] exited their vehicle and approached Mendoza-Marcos. According to Agent Fischels, he identified the agents as law enforcement and indicated that Mendoza-Marcos matched the description of the person for whom they were searching, communicating with Mendoza-Marcos in Spanish. *See* Motion Hearing Transcript[3] at 13-15.

Upon further questioning, it became apparent to the agents that Mendoza-Marcos was not the suspect from the stabbing incident. However, after requesting some identification, the agents became suspicious when Mendoza-Marcos failed to produce a driver's license or other government-issued identification.[4] Mendoza-Marcos indicated that he lived in the apartment above the laundromat with other individuals, but also stated that he was unsure whether any of the other residents were in the apartment. Agent Fischels testified that, at that point, he asked Mendoza-Marcos where he was from and Mendoza-Marcos told the agents that he was from Guatemala. Agent Fischels further questioned Mendoza-Marcos regarding whether he had any immigration documents that authorized him to reside or work within the country and Mendoza-Marcos stated that he did not. The

---

[1](…continued)
Government Exhibit 1 (docket no. 33).

[2] Photos of the laundromat have been filed as Government Exhibits 3 and 4 (docket nos. 33-2, 33-3).

[3] The transcripts from the hearings on the Motion have been filed in two consecutively paginated documents (docket nos. 53, 55). The court shall refer to such consecutive pagination when citing to the transcripts.

[4] At the hearing, Agent Fischels indicated that he did not remember precisely what form of identification Mendoza-Marcos produced, but indicated that it was not a government-issued means of identification.

agents testified that they then placed Mendoza-Marcos under arrest and informed him that he would be taken to the immigration office for processing. However, the agents neither placed Mendoza-Marcos in handcuffs nor restrained him in any way. Agent Fischels testified that he asked Mendoza-Marcos whether he had any belonging in the apartment that he wished to retrieve. Mendoza-Marcos indicated that he did. According to the agents, they asked Mendoza-Macos whether they could accompany him in the building and he stated that they could. However, at the hearing, Mendoza-Marcos testified that the agents never identified themselves as law enforcement, asked him where he lived or whether he lived alone, never informed him that he was under arrest or that he was being taken to the immigration office, and never asked whether he had any belongings that he wanted to gather or whether they could accompany him inside.

Before entering the building, Mendoza-Marcos had a conversation with another individual through the window above the door into the building. At the hearing, neither the agents nor Mendoza-Marcos testified as to the content of the conversation. The record is unclear whether Mendoza-Marcos or the other individual then opened the door to the building. The agents and Mendoza-Marcos then entered the building and proceeded up the stairs to the apartment. It is undisputed that Mendoza-Marcos never explicitly told the agents that they could not enter the building.

After entering the apartment, the agents observed two other individuals sitting in a common area. The agents identified themselves and asked whether there were other persons in the apartment. The individuals in the common area indicated that there was another individual sleeping in a bedroom. The agents directed the individuals from the common area to retrieve the individual from the bedroom and they did so. The individual from the bedroom was Defendant. The agents identified themselves to Defendant and directed all of the occupants of the apartment to sit on the couches in the common area. The agents explained that they were searching for the stabbing suspect and requested

identification from Defendant and the two other individuals found in the apartment. Though all three occupants complied, none of them were able to produce any government-issued identification. The agents determined that none of the occupants of the apartment were the suspect for whom they were searching but grew suspicious that the occupants may be undocumented aliens.

The agents questioned the individuals and asked whether they were legally in the United States. They admitted that they were not. At that time, the agents placed the three other individuals under arrest and explained that they would be transported to the immigration office for processing and fingerprinting. The agents allowed the occupants to gather certain belongings to take with them to the immigration office and allowed Defendant to change out of his sleeping attire. The occupants, including Defendant, were all transported to the immigration office and processed.[5] Prior to being transported, the occupants were handcuffed, but were not informed of their *Miranda* rights. As part of their processing at the immigration office, the agents obtained biographical information from the individuals and a criminal history check was conducted. None of the individuals, including Defendant, had a criminal history. However, Agent Fischels testified that Defendant had an "immigration history," meaning that Defendant had prior encounters with immigration officials and had been assigned an "A number." At some point, either during their initial encounter or after placing Defendant under arrest, the agents obtained a Carlson Building Management identification card from Defendant and the card was added to Defendant's A-file.

### B. The 2015-2016 Investigation

At the hearing on the Motion, Department of Homeland Security–Immigration and Customs Enforcement Officer Justin Osterberg testified that, on or about December 22,

---

[5] Defendant's Report of Deportable/Inadmissable Alien from the December 20, 2011 incident has been admitted as Government Exhibit 2 (docket no. 33-1).

2015 an email from Officer Richard Moore to Officer Jonathan Kovach of the Department of Homeland Security was placed on Officer Osterberg's desk.[6] Officer Kovach had been conducting surveillance on a certain residence and, during the course of that investigation, made note of a series of license plate numbers. The email from Officer Moore to Officer Kovach showed that one of the license plate numbers from that investigation belonged to a 2011 Ford Fiesta registered to Defendant. The email also listed Defendant's address, date of birth and a social security number ending in 4601. At the hearing on the Motion, Officer Osterberg testified that he ordered Defendant's A-file on January 7, 2016 and received it on January 19, 2016.

On January 21, 2016, Officer Osterberg sent an email to investigator Matthew Dingbaum of the Iowa Department of Transportation, asking whether the social security number that Defendant had used to register the Ford Fiesta was used to register any other vehicles.[7] Dingbaum indicated that there was another vehicle registered to Defendant under the social security number ending in 4601. Dingbaum also indicated that the social security number was issued in Colorado in 1997-1998 and "assum[ed] the [social security number] does not belong to [Defendant]." Government Exhibit 7 at 1. Officer Osterberg indicated that he would contact the Social Security Administration to verify.[8] That same date, Officer Osterberg received an email from Special Agent Juston Jennings of the Social Security Administration–Office of Inspector General indicating that the social security

---

[6] The email chain between Officers Moore and Kovach has been admitted as Government Exhibit 6 (docket no. 33-5).

[7] The email chain between Officer Osterberg and Dingbaum has been admitted as Government Exhibit 7 (docket no. 33-6).

[8] Officer Osterberg also requested that Dingbaum run facial recognition using a photo obtained from a February 9, 2004 "border event" involving Defendant under the name Alejandro Hernandez-Hernandez. *See* Government Exhibit 7 at 2. The border event report has been admitted as Government Exhibit 8 (docket no. 33-7).

number ending in 4601 did not belong to Defendant, but rather "is assigned to someone else." Government Exhibit 9 (docket no. 33-8) at 1.

During his review of Defendant's A-file, Officer Osterberg found the Carlson Building Management identification card that had been placed in the A-file following the search in December 2011. On February 12, 2016, Officer Osterberg contacted the human resources manager from Carlson Building Management and requested a copy of Defendant's I-9 employment form.[9] Although the I-9 form from Carlson Building Management was not produced at the hearing, the government contends that the I-9 form shows Defendant used a social security number which does not belong to him—specifically, the social security number ending in 4601.

On March 23, 2016, Officer Osterberg emailed an investigator with Iowa Workforce Development, requesting further information on Defendant's use of the social security number ending in 4601.[10] The investigator with Iowa Workforce Development identified two other employers for the social security number used on the Carlson Building Management I-9: Cancun #2, Inc. and Adelitas Mexican Grill. At the hearing on the Motion, Officer Osterberg testified that he attempted to obtain I-9 forms from Cancun #2, Inc. and Adelitas Mexican Grill but was unable to do so because the forms had been misplaced, could not be found or the company did not have them on hand. However, Officer Osterberg was able to obtain a W-2 or W-4 from Adelitas Mexican Grill, though it was not introduced into evidence.

On May 31, 2016, Judge Scoles held a detention hearing for Defendant. Officer Osterberg testified that he had conducted a review of a range of A numbers after a recent

---

[9] The email chain between Officer Osterberg and the human resources manager from Carlson Building Management has been admitted as Government Exhibit 10 (docket no. 33-9).

[10] The email between Officer Osterberg and the investigator with Iowa Workforce Development has been admitted as Government Exhibit 11 (docket no. 33-10).

reorganization in his office. *See* Detention Hearing Transcript (docket no. 29) at 4. Officer Osterberg testified that the investigation into Defendant started because of an "expired call-up" or routine check-in on Defendant's A-file. *Id.* After seeing the expired call-up, Officer Osterberg stated that he ordered the A-file at that time, "because the A[-]file was not located centrally in [his] office." *Id.* After reviewing the A-file, Officer Osterberg testified that he found the Carlson Building Management identification card and then began his investigation into Defendant's use of the social security number at issue. However, at the hearing on the Motion, Officer Osterberg stated that he had forgotten about the December 22, 2015 email from Officer Kovach at the detention hearing and that his testimony at the detention hearing that he had no other outside information regarding Defendant was erroneous. He stated that he remembered the December 22, 2015 email after he had left the detention hearing and was driving back to his office.

## V. ANALYSIS

In the Objections, Defendant argues that Judge Scoles erred in finding that: (1) Mendoza-Marcos consented to a search of his apartment; (2) any consent, if given, was voluntary; (3) the seizure of the occupants of the apartment, including Defendant, was lawful; and (4) the inevitable discovery doctrine applied to Defendant's A-file. *See* Objections at 1. The court shall address each of these objections separately.

### A. Consent to Enter

Defendant argues that Judge Scoles erred in finding that Mendoza-Marcos did, in fact, give verbal consent to Agents Fischels and Lund to enter the apartment on December 20, 2011.[11] Brief in Support of the Objections (docket no. 41-1) at 2. Defendant argues that, because the officers testified that Mendoza-Marcos gave them verbal consent to enter

---

[11] Defendant repeatedly refers to a "search" of the apartment in 2011. *See* Brief in Support of the Objections (docket no. 41-1) at 2-5. However, there is no evidence that the agents conducted a search within the apartment. Instead, Defendant's arguments make clear that he is alleging that the agents' entry into the apartment was unlawful.

the apartment and Mendoza-Marcos testified that he did not, the court should hear additional evidence to make a credibility finding. *Id.* Defendant argues that such a finding "cannot be determined from the record." *Id.*

The Fourth Amendment to the United States Constitution provides "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). "Warrantless searches 'are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Goodale*, 738 F.3d 917, 921 (8th Cir. 2013) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 481 (1971)). "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *United States v. Wolff*, ___ F.3d ___, ___, 2016 WL 4010514, at *3 (8th Cir. July 27, 2016) (alteration in original) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). Such consent can be obtained "either from the individual whose property is searched, or from a third party who possesses common authority over the premises." *Rodriguez*, 497 U.S. at 181 (citing *Schneckloth*, 412 U.S. at 218; *United States v. Matlock*, 415 U.S. 164, 171 (1987)).

The court finds that Mendoza-Marcos did consent to the agents' entry into the apartment. It is undisputed that, during the initial encounter between Mendoza-Marcos and the agents, Mendoza-Marcos produced some form of identification. It is also undisputed that, after speaking to the agents, the agents and Mendoza-Marcos entered the apartment. At the hearing on the Motion, Agent Fischels testified that it is standard practice to allow a person being detained for processing to retrieve belongings from their residence. Despite Mendoza-Marcos's testimony to the contrary, the undisputed events, along with Agent

Fischels's testimony, indicate that Mendoza-Marcos was indeed placed under arrest outside of the apartment. Because he was placed under arrest, it is reasonable to believe that the agents would not permit Mendoza-Marcos to enter the apartment unaccompanied, but would rather seek consent to accompany him. Agent Fischels further testified that he asked whether the agents could accompany Mendoza-Marcos into the building and that Mendoza-Marcos consented. This testimony was corroborated by Agent Lund. It is further undisputed that a brief conversation was held with a third-party from the window above the door to the apartment, which is inconsistent with Mendoza-Marcos's testimony that the officers "just went in" to the apartment.

Furthermore, Mendoza-Marcos admitted that he never told the agents that they could not enter the apartment. Insofar as Mendoza-Marcos testified that the agents did not request consent to enter the apartment and Mendoza-Marcos did not act to prevent them from entering with him to retrieve his belongings, it would be reasonable for an agent in Agents Fischels and Lund's position to believe that Mendoza-Marcos consented to entry where Mendoza-Marcos spoke with an occupant of apartment in the agents' presence prior to entry into the appartment, possibly to procure entrance into the apartment, and where Mendoza-Marcos did not attempt to prevent the agents from following. *See United States v. Farnell*, 701 F.3d 256, 263 (8th Cir. 2012) (recognizing that "a person can render a search legal by behaving in a way that would cause a reasonable person to believe that he or she has knowingly and voluntarily consented, whether or not the person actually intends to consent" (quoting *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004)). Additionally, the court notes that Mendoza-Marcos denied both relevant and non-relevant facts at the hearing on the Motion. For example, he denied that he ever consented to the agents' entry into the apartment but also denied that the agents ever identified themselves as law enforcement, asked him where he lived or whether he lived alone. Such a general denial undermines Mendoza-Marcos's credibility, especially in light of the unlikelihood

that a suspect would allow individuals who did not identify themselves as law enforcement to place that suspect under arrest and then accompany that suspect into his or her place of residence. Testimony so at odds with the objective facts established in the record causes the court to view the entirety of the witness's testimony as less credible.

Based on a review of the record, the court is satisfied that Mendoza-Marcos did, in fact, consent to the agents' entry into the apartment. To the extent that Mendoza-Marcos's testimony is inconsistent with reasonable inferences drawn from the record, the court finds his testimony less credible than that of Agents Fischels and Lund. The court finds that an additional hearing to receive evidence is unnecessary to make a credibility finding. Accordingly, the court shall overrule the Objections with respect to whether Mendoza-Marcos consented to entry into the apartment.

### B. Voluntary Consent

Defendant argues that, even if the court finds that Mendoza-Marcos did, in fact, give consent to the agents, Judge Scoles erred in finding that such consent was voluntary. He argues that the "facts developed at the hearing [on the motion] do not support that finding." Brief in Support of the Objections at 3. Any consent, if given, must be voluntary. *See United States v. Comstock*, 531 F.3d 667, 676 (8th Cir. 2008). "The [g]overnment bears the burden of establishing, by a preponderance of the evidence, that consent was voluntary . . . ." *Id*. The scope of the consent "is based on the totality of the circumstances including the interaction between the parties, the purpose of the search, and the circumstantial evidence surrounding the search." *United States v. Beckmann*, 786 F.3d 672, 679 (8th Cir. 2015). Courts consider a variety of factors in determining whether consent was voluntary, including: "a defendant's age, intelligence, and education; whether he cooperates with police; his knowledge of his right to refuse consent; and his familiarity with arrests and the legal system." *United States v. Bearden*, 780 F.3d 887, 895 (8th Cir. 2015). Courts also consider "environmental" factors in determining the voluntariness of

consent, including: "whether [law enforcement] threatened, intimidated, punished, or falsely promised something to the defendant; whether the defendant was in custody or under arrest when consent was given and, if so, how long he had been detained; and whether consent occurred in public or secluded area." *Id.* Additionally, courts consider the length of time the subject was detained and whether the subject objects during the course of the search. *See Comstock*, 531 F.3d at 676-77 (quoting *United States v. Saenz*, 474 F.3d 1132, 1137 (8th Cir. 2007)). Though the factors guide the court's analysis, the court does not engage in a mechanical application of them—whether consent was voluntary is determined based on a review of the totality of the circumstances. *Id.*

Defendant relies on the fact that Judge Scoles found that the "record was silent on age and education, and past experience" to argue that the relevant factors "all strongly fa[v]or a finding of involuntary consent." Brief in Support of the Objections at 5. Defendant highlights the facts that he was seized at the time the consent was given and that he was not read his *Miranda* rights at that time. *Id.* At the hearing on the Motion, Agent Fischels testified that, at the time that Mendoza-Marcos gave consent to search the apartment, they neither read him his *Miranda* rights nor informed him of his right to refuse consent. The agents also did not explicitly ask him about his age, education level or whether he was intoxicated. Agent Fischels also admitted that, at the time Mendoza-Marcos gave consent, he had been seized. However, Judge Scoles opined that Defendant appeared to be approximately thirty years of age and Defendant has not objected to this characterization. Additionally, from a review of Mendoza-Marcos's testimony at the hearing and the nature of his answers to questions posed by Agents Fischels and Lund at the time of the entry, it is apparent that Mendoza-Marcos is at least of average intelligence. Mendoza-Marcos gave appropriate answers to questions at the time of the 2011 encounter with the agents and in open court. Furthermore, Judge Scoles found that "there is no evidence [that Mendoza-Marcos] was intoxicated or under the influence of any controlled

substance"—a conclusion that Defendant has not challenged and that, in fact, is supported by both the agents' testimony and the fact that Mendoza-Marcos was returning home from work at 8:00 a.m. when he came in contact with the agents. Report and Recommendation at 12. As Judge Scoles found, it is undisputed that Mendoza-Marcos was not informed of his *Miranda* rights and the agents did not inform him of his right to refuse consent, though Mendoza-Marcos's testimony at the hearing on the Motion that he did not provide consent suggests that, at the very least, he may have believed he had the ability to refuse. Additionally, there is no evidence that Mendoza-Marcos had previously been arrested or detained, and the agents testified that the criminal background checks on the occupants of the apartment all came up negative.

While Mendoza-Marcos had indeed been seized at the time he gave his consent, the amount of time between detainment and the consent was negligible. The agents testified that they did not display their weapons or raise their voices, nor did the occupants appear frightened. At the time that consent was given, there is no evidence in the record suggesting that the agents made any promises to Mendoza-Marcos.[12] Additionally, the encounter occurred in a public parking lot; although, as Judge Scoles noted, the parking lot was situated behind a building and there were no witnesses or bystanders.

Having reviewed the factors and viewing the evidence in light of the totality of the circumstances, the court finds that Mendoza-Marcos's consent was freely and voluntarily

---

[12] Although not raised by Defendant, Mendoza-Marcos appeared to testify that the agents made certain promises to the occupants of the apartment that they would be released after a background check. Although the court doubts that such promises were made, as Agents Osterberg and Lund testified that they made no such statements, such promises would not impact the court's findings because the only testimony in the record pertaining to the alleged promises states that they were made after the officers had already obtained consent and entered the apartment. *Cf. Forman v. Richmond Police Dept.*, 104 F.3d 950, 960 (7th Cir. 1997) (noting that evidence found prior to a defendant's withdrawal of consent to search remains admissible).

given. The encounter between the agents and Mendoza-Marcos was non-coercive—he was not placed in restraints, was able to communicate with the agents through Agent Fischels who is fluent in Spanish, the agents did not brandish or draw their weapons, the encounter was carried out in a conversational tone without raised voices or shows of authority and, as the court has previously noted, the agents followed protocol in obtaining Mendoza-Marcos's consent. Few factors, if any, weigh against a finding that consent was voluntary, and a review of the totality of the circumstances convinces the court that Mendoza-Marcos voluntarily consented to the agents' entry into the apartment. Accordingly, the court shall overrule the Objections with respect to the voluntariness of consent.

### C. Seizure

Defendant also argues that the agents did not have reasonable suspicion to seize him during the December 20, 2011 entry. Brief in Support of the Objections at 5. He argues that the factors that Judge Scoles found to support a reasonable suspicion that Defendant was in the United States illegally do not, in fact, support such a reasonable suspicion. *Id.* at 6. Specifically, Defendant argues that the facts that the occupants of the apartment were Latino and spoke Spanish was insufficient to establish reasonable suspicion. *Id.* at 7. Defendant further argues that merely residing in the same apartment as Mendoza-Marcos, whom the agents had already determined was in the country illegally, does not create any more reasonable suspicion than "being a bystander in a drug raid." *Id.*

The Fourth Amendment does not prohibit all warrantless seizures of persons. "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Roelandt*, ___ F.3d ___, ___, 2006 WL 3563323, at *1 (8th Cir. June 30, 2016) (alteration in original) (quoting *United States v. Cornelius*, 391 F.3d 965, 967 (8th Cir. 2004)). The court examines "the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal

wrongdoing." *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Reasonable suspicion is a standard resistant to any authoritative or neat definition. *See Illinois v. Gates*, 462 U.S. 213, 232 (1983). "Reasonable suspicion must be supported by more than a 'mere hunch,' but 'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard.'" *United States v. Roberts*, 787 F.3d 1204, 1209 (8th Cir. 2015) (quoting *Arvizu*, 534 U.S. at 274). The demand that the court examine the totality of the circumstances requires the court to view the evidence with the understanding that "officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.'" *Id.* (quoting *Arvizu*, 534 U.S. at 273). Additionally, immigration officials may "interrogate any alien or person believed to be an alien as to his right to be or remain in the United States" even absent a warrant. 8 U.S.C. § 1357(a)(1).

Defendant relies on *United States v. Brignoni-Ponce*, 422 U.S. 873, 886-87 (1975), to argue that the agents' use of apparent ancestry cannot support a reasonable suspicion that the occupants were in the country illegally. *See* Brief in Support of the Objections at 6. In *Brignoni-Ponce*, the Supreme Court held that the apparent Mexican ancestry of a defendant, taken alone, cannot furnish reasonable grounds to believe that individuals are in the country illegally. 422 U.S. at 886. However, the Supreme Court also recognized that a suspect's ancestry can indeed be "a relevant factor." *Id.* at 887. The Supreme Court's admonition that, "standing alone [apparent ancestry] does not justify stopping all Mexican-Americans to ask if they are aliens" does not invalidate every use of apparent ancestry in the investigation of immigration offenses. *Id.* Thus, the Supreme Court has not ruled out the use of a suspect's apparent ancestry to develop reasonable suspicion, so long as it is not the sole basis for such suspicion. Here, Defendant himself admits that the agents relied on several factors to explain their reasonable suspicion. *See* Brief in Support

of the Objections at 5-8. Accordingly, Defendant's reliance on *Brignoni-Ponce* is inapposite.

Defendant also cites authority from outside the circuit to argue that "the race of an individual cannot be considered in determining whether an officer has or had reasonable suspicion in connection with a *Terry* stop, including for immigration investigation." *Id.* at 7 (citing *United States v. Montero-Camargo*, 208 F.3d 1122 (9th Cir. 2000)). However, the Eighth Circuit has recognized that factors such as the language a suspect speaks or his or her apparent nationality "may be relevant factors in some instances" to support reasonable suspicion. *United States v. Garcia*, 23 F.3d 1331, 1335 (8th Cir. 1994). The Supreme Court, in *Brignoni-Ponce*, recognized that apparent national origin is relevant to immigration cases. 422 U.S. at 886-87 ("The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor . . . ."). In any event, Defendant has cited no authority from within the Eighth Circuit that takes such a restrictive view on the factors law enforcement may consider to establish probable cause. The court declines to so shackle law enforcement in this case.

Finally, Defendant cites *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979), to argue that Defendant's mere proximity to Mendoza-Marcos, due to their status as roommates, cannot create reasonable suspicion. Brief in Support of the Objections at 8. In *Ybarra*, the Supreme Court noted that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to [seize] that person." 444 U.S. at 91. Instead, "[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another . . . ." *Id.* The court notes that reasonable suspicion is a lesser standard than the probable cause standard addressed in *Ybarra*. In any event, the agents relied on more than Defendant's "mere

propinquity" to Mendoza-Marcos in determining that there was reasonable suspicion to believe that Defendant may be in the country illegally. Both agents testified that they observed that all residents of the apartment appeared to be Latino and all spoke Spanish.[13] The agents also testified that, in their experience, it is common for undocumented aliens to reside together and that males around the same age, with no apparent familial connection, further raise the suspicion that they may be in the country illegally. Thus, it was not the mere fact that Defendant was in close proximity to Mendoza-Marcos, or even that he was physically in the apartment at the time that Mendoza-Marcos was seized, that aided the agents in developing reasonable suspicion with respect to Defendant. Rather, it was Defendant's relationship with Mendoza-Marcos, as a non-familial co-occupant of the apartment, that roused suspicion in the agents.

After reviewing all of the information known to and relied upon by the agents at the time they seized Defendant, the court finds that the agents had reasonable suspicion to believe that Defendant may be in the country illegally. They properly observed that the occupants of the apartment appeared to be Latino, primarily spoke Spanish and were unrelated adult males. The agents testified that, based on their experience, these factors are all signs that a person may be an undocumented alien. Based on the totality of the circumstances as outlined by the court and the officers at the hearing on the Motion, the court is satisfied that the agents developed reasonable suspicion to seize Defendant. Accordingly, the court shall overrule the Objections with respect to Defendant's seizure.

### D. Inevitable Discovery Doctrine

Finally, Defendant argues that Judge Scoles erred in finding that the inevitable discovery doctrine applies in this case. Brief in Support of the Objections at 8. Defendant relies on Officer Osterberg's conflicting testimony between the detention hearing and the

---

[13] Agent Lund testified that he placed no weight on the fact that the occupants appeared to be Latino.

hearing on the Motion. *Id.* at 9. He argues that the "two diametrically opposed stories" given by Officer Osterberg require the court to find that the government has failed to carry its burden to establish that it would have inevitably discovered the information leading to the Indictment. *Id.* at 11.

Under the "fruit of the poisonous tree" doctrine, the exclusionary rule not only prohibits introduction of evidence seized during an unlawful search but also any "derivative evidence . . . that is otherwise acquired as an indirect result of the unlawful search." *United States v. Davis*, 760 F.3d 901, 903 (8th Cir. 2014). However, even if a search violates the Fourth Amendment and the fruits of the search would ordinarily be excluded, such evidence "may still be admissible if the government can show it would have been inevitably discovered." *United States v. Allen*, 713 F.3d 382, 387 (8th Cir. 2013). "If the government 'can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . [then] the evidence should be received." *Id.* (alterations in original) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)).

Given the court's finding that the December 20, 2011 entry was constitutional, the court need not address whether the inevitable discovery doctrine applies. Regardless of whether Officer Osterberg would have determined that Defendant misused a social security number absent the entry on December 20, 2011, the court has found that the evidence, including the identification card from Carlson Building Management, was properly seized. Thus, even if the 2015-2016 investigation was prompted by an expired call-up number, as Defendant argues, suppression of the A-file and its contents is unwarranted.

## VI. CONCLUSION

In light of the foregoing, the Objections (docket no. 41) are **OVERRULED**, the Report and Recommendation (docket no. 34) is **ADOPTED** and the Motion (docket no. 20) is **DENIED**.

**IT IS SO ORDERED.**

**DATED** this 24th day of August, 2016.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA